FRANK CASSIDY *vs.* OLD COLONY RAILROAD COMPANY.

Suffolk. Nov. 16, 1885. — Feb. 25, 1886. DEVENS, W. ALLEN, & GARDNER, JJ., absent.

A petition to the Superior Court for a jury to assess against a railroad corporation damages caused to land adjoining that taken for the location of the railroad and conveyed to the corporation by the petitioner's predecessor in title, by subsequently cutting off, in changing the grade of the road, all natural drainage of surface water from the adjacent lands, by discharging surface water from the road-bed of the railroad upon the petitioner's land, and by shutting off the view, light, and air therefrom, cannot be maintained.

PETITION to the Superior Court, filed October 8, 1883, for a jury to assess damages alleged to have been incurred by the petitioner in the use and occupation of his land and dwelling-house, by reason of the respondent's elevating its road-bed adjoining the petitioner's land nine feet, on March 23, 1882, according to a location filed in the city clerk's office of the city of Boston. Trial before *Knowlton*, J., who allowed a bill of exceptions, in substance as follows:

The petitioner, on February 9, 1883, filed his original petition with the mayor and aldermen of the city of Boston for said damages; and, on April 2, 1883, said mayor and aldermen granted the petitioner leave to withdraw.

The petitioner offered to prove the following facts: In 1845, one Wolkins and others owned a parcel of marsh land in what is now called South Boston. The respondent, by virtue of its charter, located its road-bed forty feet wide over and across said parcel, leaving parts of said parcel on both the easterly and westerly sides of said location. Wolkins and others, on June 18, 1845, in consideration of ten cents a square foot, conveyed by quitclaim deed said strip forty feet wide to the respondent and its assigns.

The petitioner, by sundry mesne conveyances from said Wolkins and others, on November 30, 1869, became the owner of a part of the parcel of land, with the dwelling-house thereon built about the year 1850, on the easterly side of said forty-foot strip, and bounded thereby for a distance of sixty-six feet.

The respondent originally, in 1845, constructed its road-bed at a grade of about two feet above the level of said marsh

land, and maintained said road-bed at that grade from 1845 to 1882 along by the petitioner's land and on the westerly side thereof.

In the year 1846, Wolkins laid out and dedicated for public use Ewer Street, a way running westerly from what is now Ninth Street, to and across said railroad, which it intersected at the grade of said road-bed; and Ewer Street was used for more than twenty years as a street leading from Ninth Street across said railroad to Dorchester Avenue, and passed the premises of the petitioner on the southerly side thereof.

Ewer Street, from the time of its laying out, in 1846, down to the year 1882, was of gradual descent from Ninth Street to the railroad, and surface water from Ninth Street and the lands abutting on Ewer Street flowed in and over Ewer Street to said railroad land, and thence passed through a ditch and wooden sluiceway built at the intersection of Ewer Street with the railroad road-bed across said road-bed to the marsh land on the westerly side of the railroad. During this period, the premises now owned by the petitioner were drained of all surface water through Ewer Street to said railroad land, and no surface water ever backed or flowed from said road-bed in and upon said premises; and from and after the year 1850, when the petitioner's house was built, to the year 1882, the land about said house was one foot higher than the grade of said road-bed, on the westerly side thereof, and the sill of said house was four feet higher than said road-bed, there being a basement and cellar under said house.

The house and land had enjoyed and received free view, light, and air, during said period, in, through, and over said road-bed, obstructed only by the passing trains of the respondent and by a board fence four feet high, built and maintained between said road-bed and said premises by the petitioner and his grantors; and from the ground to the bottom of each window in the first story the distance was eight feet, the windows being four and one half feet high.

At or about the time railroads were required by statute to erect and maintain fences along their lines (1874), the respondent built a fence along the easterly line of its road-bed across Ewer Street to and connecting with said fence of the petitioner,

and maintained its fence across Ewer Street to the year 1882, but without interrupting the flow of surface water from the petitioner's land and Ewer Street into the ditch and sluiceway aforesaid of the railroad.

The respondent, in the latter part of 1882, raised its road-bed along the whole western boundary of the petitioner's premises, and across the end of Ewer Street, by building upon its boundary line a stone wall of solid masonry, and building a close board fence on top of said wall, the wall being nine feet high and the fence five feet high, the whole structure extending up fourteen feet, more or less, above the grade of Ewer Street and the petitioner's land. No culverts or drains were provided for said surface water by the respondent in or under said wall; and the respondent filled up its road-bed to a height at least nine inches above said wall, sloping down to the top of the wall.

Immediately upon the construction of said works by the respondent, great quantities of surface water accumulated upon the petitioner's premises and in the basement of his house, said water coming from Ninth Street and Ewer Street, and the lands adjoining thereto, and from off said railroad bed, and remained standing upon said premises and in Ewer Street, because the natural and customary flow of surface water before mentioned had been obstructed and destroyed by said works, and no drainage provided in its stead. The surface water and subsequent accumulations of surface water from the causes aforesaid remained upon and around the petitioner's premises during the winter of 1882 and 1883, to such an extent as to render said premises unfit to live in and difficult of access. The petitioner thereupon, in said winter, to relieve his premises in a measure from the bad and untenantable condition in which they were put by said structure, was obliged to and did raise his dwelling-house five feet, by a brick cellar wall placed under the same, filled up the former cellar or basement, and filled in his own premises and Ewer Street in front thereof to a depth of three and one half feet at said railroad wall, and for a long distance up Ewer Street, to divert the surface water draining therein from said premises. Still great quantities of surface water came and continue to come upon the petitioner's premises from said railroad bed, elevated as it is, being especially noticeable in the winter and

during heavy rain-falls; and the petitioner has no adequate means of preventing such drainage upon his premises.

Before the petitioner raised his house, said wall with the fence on top extended above the tops of said first-story windows, entirely obstructing the view therefrom and greatly depriving said windows and the house of the light and air which had been enjoyed previously, and, even after the petitioner raised his house, as aforesaid, the top of said fence was on a level with the middle of said windows, and so continues at the present time, greatly obstructing said windows and the light, air, and view appurtenant thereto. The house, which is thirty-five feet long on its westerly side, is situated very near said railroad wall and fence, its northwest corner being five feet and six inches therefrom, and its southwest corner seventeen feet and seven inches; and the obstruction of the light, air, and view from said first-story windows on that side is very great.

The petitioner, in raising his house and filling in about the same, was put to an expense of $1000, for money paid out, loss of rent, and labor; and, in addition thereto, the petitioner's premises are permanently damaged in a further sum of not less than $1000, by being less favorably situated than before the raising of the grade of said railroad, in respect to view, light, and air, and being for all time subjected to great quantities of water from the surface of said road-bed.

Upon this offer of proof, the judge ruled that the petition could not be maintained; and ordered the same to be dismissed. The petitioner alleged exceptions.

*N. C. Berry & J. K. Berry*, for the petitioner.

*J. H. Benton, Jr.*, for the respondent.

HOLMES, J. The taking of land for a railroad " is an appropriation of the land to all the uses of the land for the road, necessary and incidental. . . . . Practically the damages are commonly equal to the value of the land. . . . . The right and power of the company to use the land within their limits may not only be exercised originally, when their road is first laid out, but continues to exist afterwards; and if, after they have commenced operations, it is found necessary, in the judgment of the company, to make further uses of the land assigned to them, for purposes incident to the safe and beneficial occupation of

the road, by raising or lowering grades, cutting down hills, and removing trees, they have a right to do so to the same extent as when the railroad was originally laid out and constructed." *Brainard* v. *Clapp*, 10 Cush. 6, 8, 10. *Callender* v. *Marsh*, 1 Pick. 418, 432. Thus the law stood at the time of the location of this railroad, in 1845, and thus it still stands, unless special provision for further compensation is made by statute. *Boston* v. *Richardson*, 13 Allen, 146, 159. *Pierce* v. *Drew*, 136 Mass. 75.

It follows that the respondent must be presumed to have paid, at the time of its original location, for the damage now sought to be recovered for, so far as such damage was proper to be considered; and even if the statutes now provided proceedings to recover damages against railroads in case of a subsequent change of grade, it would require a pretty strong argument to convince us that they were intended to give further damages in a case where full compensation had been paid originally. No such statute, however, has been called to our attention.

Again, the claim stated by the petitioner, on which the court ruled, was for cutting off all natural drainage of surface water from the adjacent lands, discharging surface water from the respondent's road-bed upon the adjoining land of the petitioner, and shutting off the view, light, and air from the petitioner's premises. None of these acts infringed any common-law rights of the petitioner. They would have been perfectly lawful on the part of any other adjoining owner. *Gannon* v. *Hargadon*, 10 Allen, 106. *Franklin* v. *Fisk*, 13 Allen, 211. *Bates* v. *Smith*, 100 Mass. 181. *Rathke* v. *Gardner*, 134 Mass. 14. *Keats* v. *Hugo*, 115 Mass. 204. And we are not aware that it has been decided in this Commonwealth that they form a substantive ground of recovery under the railroad acts, although, if land were taken, as it was from the petitioner's predecessors in title at the time of the original location, some portion of this kind of damage to the remaining land might be considered, according to *Walker* v. *Old Colony & Newport Railway*, 103 Mass. 10. See *Morrison* v. *Bucksport & Bangor Railroad*, 67 Maine, 353; *Fay* v. *Salem & Danvers Aqueduct*, 111 Mass. 27, 28.

However this may be as against a railroad exercising such rights only as it acquires by its location and subject to the duties imposed by statute, in the present case the respondent owned

the fee by conveyance from the petitioner's predecessors in title, and had all the rights, as against the petitioner, that any other owner of the fee would have had. The petitioner treats the deed as if it were a mere release of the damages then due for the original location. But it is a conveyance in ordinary form, and it had the same effect that a like deed to any other person would have had.

It is suggested that the petitioner had acquired an easement of drainage through the sluiceway built under its road by the respondent. No such claim appears to have been made at the trial ; but, if it had been made, it could not have been maintained, for no lapse of time gives a man a right to drain surface water in its natural state upon his neighbor's land ; and the mere fact that, after it reaches that land, it escapes by a ditch, makes no difference. If the petitioner had had a ditch upon his own land, the discharge from which would have been a wrong, and actionable, acquiescence in the discharge for twenty years would have given him a right. But that is not this case.

*Exceptions overruled.*